IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

**KEVIN GOODMAN, JR.,**

    **Petitioner,**

**v.**                                                      **Case No.: 2:23-cv-00122**

**SHELBY SEARLS, Warden,**
**Huttonsville Correctional Center,**

    **Respondent.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Pending before the Court are Petitioner's *pro se* Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, (ECF No. 2); Respondent's Motion and Amended Motion to Dismiss and for Summary Judgment, (ECF Nos. 12, 13); and Petitioner's Motion for Discovery, (ECF No. 21). This case is assigned to the Honorable Irene C. Berger, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

As a preliminary matter, the undersigned notes that the record before the Court is well-developed on the claims raised in the habeas petition and provides a sufficient foundation for resolving this case without the need for discovery or an evidentiary hearing. *See* Rules 6 and 8, Rules Governing Section 2254 Cases. Moreover, this Court must review Goodman's claims based solely on the state court record as there is no basis for allowing factual development at this juncture. *See Shinn v. Ramirez,* 596 U.S.

366, 377-78 (2022) ("Among other restrictions, only rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules.").

The Supreme Court of the United States, explaining the stringent requirements under Section 2254(e)(2) governing factual development of the record in federal court, stated that the petitioner bears responsibility for the failure of state postconviction counsel to develop the factual basis of a claim in state habeas proceedings. *Shinn,* 596 U.S. at 382-83. In that circumstance, the federal court may only develop the record if a claim before it relies on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§ 2254(e)(2)(A)(i), (ii). "If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the crime charged." *Shinn*, 596 U.S. at 381 (quoting § 2254(e)(2)(B)). Even then, "a federal habeas court still is not *required* to hold a hearing or take any evidence." *Id.*

In his Motion for Discovery, Goodman asks the Court to allow him to locate and depose three witnesses in South Carolina, which he claims his trial counsel failed to interview—Benita Wicker, Courtney Curry, and Tomekia Bookman. (ECF No. 21 at 1). Goodman claims that these individuals can corroborate his alibi and prove his innocence. (*Id.* at 1-2). However, Courtney Curry appeared at Goodman's trial as his corroborating  alibi witness; therefore, her deposition would not provide the Court with any evidence not already in the record. As to Benita Wicker and Tomekia Bookman, one of Goodman's primary claims in the state habeas proceeding was that

his trial counsel failed to offer evidence in support of his alibi—namely, video recordings and a photograph. As the record establishes, Goodman certainly knew from the outset of the criminal case that Ms. Wicker and Ms. Bookman could testify as possible alibi witnesses, yet he never identified or developed their absence at trial, or counsel's failure to interview them, as grounds for habeas relief, and he never attempted to obtain and submit their depositions or statements until after Respondent filed a dispositive motion in this case. As such, the undersigned **FINDS** that Goodman cannot meet either exception under § 2254(e)(2) that would justify further development of the record. Therefore, the undersigned **RECOMMENDS** that Petitioner's Motion for Discovery, (ECF No. 21), be **DENIED**.

Furthermore, after thoroughly considering the record, the undersigned conclusively **FINDS** that (1) there are no *material* factual issues in dispute, and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Respondent's Motion and Amended Motion to Dismiss and for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** this case from the docket of the Court.

## I.    <u>Relevant Facts and Procedural History</u>

On May 12, 2015, a grand jury sitting in the Circuit Court of Fayette County, West Virginia ("Circuit Court") returned an indictment against Petitioner Kevin Goodman, Jr. ("Goodman"), Antwyn Gibbs, Kentrell Goodman, Radee Hill, and Rashod Wicker, jointly charging them with four felonies: conspiracy to commit a felony, first-degree robbery, illegal entry of a dwelling, and grand larceny. (ECF No. 14-1). The indictment stemmed from a home invasion and robbery that occurred on

January 9, 2015, at the residence of Andrew Gunn in Oak Hill, West Virginia. (ECF No. 14 at 1-2). Before a trial on the indictment, Kentrell Goodman ("Kentrell"), who was Goodman's brother, and Rashod Wicker ("Wicker") pleaded guilty to first-degree robbery in exchange for dismissal of the remaining charges against them. (*Id.* at 4-5). In addition, as part of their plea bargains, the State agreed to recommend that Kentrell and Wicker be sentenced to a maximum of two years at the Anthony Center for Youthful Offenders followed by probation. (ECF No. 14-16 at 294-95; ECF No. 14-17 at 37).

On September 9, 2015, a jury trial began on the charges pending against Antwyn Gibbs ("Gibbs"), Goodman, and Radee Hill ("Hill"). (ECF No. 14-15 at 1). In his opening statement, the assistant prosecutor advised the jury that in January 2015, Kentrell was good friends with Andrew Gunn, having grown up with him in Oak Hill. Gunn lived in the home of his grandparents, Linda and Edward Knight, who also shared their home with a young granddaughter and a mentally handicapped adult. (*Id.* at 110-11, 132-34). Although the Knights disapproved, Gunn was involved in illegal activity that allowed him to have a large sum of cash on hand, which he kept in a safe in his room. (ECF No. 14-15 at 110). Kentrell had been in Gunn's room and was aware of the money in the safe. (*Id.*).

Sometime before the robbery, Kentrell and his girlfriend, Lindsay Hess ("Hess"), moved from Oak Hill to Newberry, South Carolina, to live with Kentrell's Aunt Benita and her son, Wicker. (*Id.* at 111). Goodman already resided in the Newberry area, so he and Kentrell began to socialize with each other. One day, Kentrell told Goodman about Gunn's money and how it was kept in a safe at the Knights' house. (*Id.* at 111). Goodman suggested that they go to Oak Hill and steal the money. (*Id.*).

4

However, the brothers needed a driver and a car, so they persuaded their cousin, Wicker, to drive them to West Virginia. (ECF No. 14-15 at 111-112). Kentrell and Goodman subsequently decided that they needed more help, and probably a firearm, so they also recruited Gibbs and Hill, who lived nearby in South Carolina. (*Id.* at 112).

A little after midnight on January 9, 2015, the five men loaded three guns into an Acura belonging to Hess and left Newberry headed for Oak Hill. (*Id.* at 112, 116). They arrived at the Knights' residence around 8:00 a.m., parked near some trees, and four of them—Goodman, Kentrell, Gibbs, and Hill—approached the house on foot. Two of the men entered the house through an unlocked door and held guns on the residents while the other two stole the safe, two pair of Nike shoes, and a crossbow from Gunn's room. (*Id.* at 113-15). They threw Gunn's property into the trunk of the Acura and drove back to Newberry.

After hearing about the robbery, Goodman's mother contacted the police and reported her belief that her son was involved in the crime. (*Id.* at 115). When police investigated the tip, they found the safe, crossbow, and shoes at Aunt Benita's house in South Carolina. (ECF No. 14-15 at 115). Kentrell and Wicker were questioned about the robbery; they ultimately confessed to their involvement and implicated Goodman, Gibbs, and Hill. (*Id.*). At Gibbs's residence, the police found pieces of Gunn's safe, and spent shotgun shells, which were consistent with the condition of the safe, as it displayed shotgun damage, presumably incurred when the men opened it. (*Id.* at 115-16). The prosecutor told the jury that Kentrell and Wicker had pleaded guilty to armed robbery and would be testifying during the trial. (ECF No. 14-15 at 117).

In his opening statement, Jack Thompson ("Thompson"), counsel for co-defendant Gibbs, reminded the jury that an indictment was not conclusive of guilt, and

5

the State had to prove guilt beyond a reasonable doubt. (ECF No. 14-15 at 119). He emphasized that the State's case relied primarily on the testimony of Kentrell and Wicker, who were convicted felons that received "deals" as part of their guilty pleas. (*Id.* at 119). Thompson advised the jury that they would need to weigh the credibility of Kentrell's and Wicker's testimony against the other evidence. (*Id.*).

Brandon Steele ("Steele"), Goodman's lawyer, told the jury in his opening statement that he was going to "zoom in" on how the evidence applied to his client. Steele asked the jury to pay attention to the fact that none of the stolen items was ever found in Goodman's possession, nor was he found with a large amount of cash on his person. (*Id.* at 121). Moreover, Goodman's fingerprints were not on any of the guns used in the robbery, and not one of the guns was found in his custody. Steele undermined the credibility of the victims' anticipated testimony, noting that they were scared during the commission of the crime and at least one—Mrs. Knight—had glaucoma. He added that the robbers were wearing hoods, and the Knights could not really identify them. (*Id.*). He pointed out, however, that while these witnesses did not see the faces of all of the perpetrators, at least one witness provided a crucial fact. According to Linda Knight, all four of the robbers were between 5'9" and 5'11" tall. (ECF No. 14-15 at 121-22). Goodman, on the other hand, was 6'5" making him much taller than any of the men described by Mrs. Knight. (*Id.* at 122). Steele advised the jury that Gunn had reviewed some photo line-ups after the robbery and actually identified one of the robbers as, ***not*** Goodman, but Goodman's father. (*Id.*). Steele added that Goodman's father was also Kentrell's father, and he lived in South Carolina as well. Steele indicated that Goodman would offer an alibi witness who could confirm that Goodman was in South Carolina when the robbery occurred. Steele challenged the

6

credibility of Kentrell and Wicker, noting that while they would implicate Goodman in the robbery, they had already pled guilty to the crime, their stories had changed several times, and their version of events did not entirely align with the victims' statements. (ECF No. 14-15 at 123).

Anthony Ciliberti ("Ciliberti"), counsel for Hill, likewise emphasized that the physical evidence in the case did not implicate his client. (*Id.* at 125-26). He advised the jury that the evidence connecting Hill to the robbery were the statements of Kentrell and Wicker. Ciliberti told the jury that Kentrell "outright lied" to the police when he gave his statement, and that he subsequently changed his story. (*Id.* at 126). Ciliberti stated that once Kentrell got a plea deal, which amounted to a dismissal of most of the charges, he decided to come to court and "point fingers." (*Id.*). Similarly, Wicker received a plea deal that included a favorable sentence recommendation from the State. Ciliberti stressed that Kentrell's and Wicker's credibility "becomes extremely important" considering the circumstances. (*Id.*).

The State offered eleven witnesses and multiple exhibits during the trial. Only those of particular relevance to this habeas proceeding are discussed herein. Linda Knight was the first witness to testify. (ECF No. 14-15 at 132). Mrs. Knight recalled that on the morning of January 9, 2015, she let her dogs out and began getting her granddaughter ready for school. (*Id.* at 137-38). She was sitting on the couch fixing her granddaughter's hair when she saw a shotgun easing through the unlocked front door, followed by two men. The two men allowed two other men to enter the house, and these men went directly to Gunn's bedroom. (*Id.* at 144-46). The men had their faces covered. Mrs. Knight identified the safe from a photograph and testified that the safe, some shoes, and a crossbow were missing after the men left. (*Id.* at 147-51). She stated

7

that the men were only in the house for about fifteen minutes and fled from the scene. On cross-examination by Steele, Mrs. Knight testified that the four men were not very tall and were definitely not 6'5" tall. (ECF No. 14-15 at 160-61).

Mr. Knight testified that he could not describe the perpetrators as they had covered their faces with masks. (*Id.* at 170, 175). He did recall that they had an accent, but he could not describe it. (*Id.* at 171). Mr. Knight stated that after the men told him to get on the floor and pointed their guns at him, his heart stopped. Nonetheless, he went into the kitchen, got some coffee, went to his bedroom, and they slammed his door shut. (*Id.* at 171-72). He remained in his room until the men left. (*Id.* at 172).

Andrew Gunn also testified. (*Id.* at 205). Gunn admitted that at the time of the robbery, he was a drug dealer and had $10,000 in his safe from selling marijuana and other items. (*Id.* at 215). Gunn identified Goodman as one of the robbers but claimed he could not identify the others, although he saw Kentrell behind the house. (*Id.* at 211-12, 217). Gunn confirmed that the safe, some shoes, and a crossbow were taken from his room. On cross-examination by Steele, Gunn conceded that he did not identify Goodman as one of the robbers when initially questioned by the police. (*Id.* at 225). Instead, he said that he did not know any of the four men, although one of them resembled a man named Robert Lee. Gunn also admitted that he picked someone out of a photo line-up who was not Goodman, and he described one of the perpetrators as dark-skinned, kind of stocky, with a round stomach, low fade haircut, little facial hair, narrow chin, and a long face, which was not a true description. (ECF No. 14-15 at 229-30). He testified that he did not name Goodman as a suspect when first asked because he was not certain until later—after he "put it all together." (*Id.* at 235). Gunn confirmed that he was friends with Kentrell, had known him since childhood, and did

8

not want to be in court at the trial. (ECF No. 14-15 at 230-31).

Lindsey Hess testified next. (*Id.* at 241). Hess stated that she and Kentrell moved to South Carolina and, in January 2015, lived with Kentrell's Aunt Benita. (*Id.* at 242). She stated that Wicker and Goodman frequently visited Aunt Benita's house. (*Id.* at 242-43). According to Hess, she overheard a conversation between Kentrell and Goodman one afternoon about robbing Andrew Gunn, who was Kentrell's friend. (*Id.* at 244-47). She heard Goodman discussing how he could get firearms and people to help and encouraging Kentrell to participate. (*Id.* at 245-46). Hess testified that sometime in the early morning of January 9, 2015, she awoke to find Kentrell and her Acura gone. (*Id.* at 248). At around 1:00 a.m., she received a text message from Goodman's girlfriend, Courtney, asking of his whereabouts; Hess learned from a friend of Aunt Benita named Tamika, presumably Tomekia Bookman, that Kentrell and Goodman had left for West Virginia, so she relayed that information to Courtney. (*Id.* at 249-50). Courtney came by Aunt Benita's house some hours later but did not stay long. Around noon, Hess saw that her car was back, and she also saw Kentrell, Wicker, and Goodman outside of the house with a safe. (ECF No. 14-15 at 253-54). Hess testified that in the following days, Goodman purchased various items for her and Kentrell, who were expecting a baby. She recalled that Kentrell and Goodman also bought an Xbox console and television. (*Id.* at 256-59).

The prosecutor offered several exhibits, pieces of evidence, forensic experts, and law enforcement officers, none of whom connected the physical evidence directly to Goodman. In addition, the officers confirmed that they had not taken any steps to verify Goodman's alibi. The prosecutor then offered Kentrell as a witness. (ECF No. 14-16 at 219). Kentrell testified that he was born in South Carolina, but had spent most of

his life in West Virginia. (ECF No. 14-16 at 220). He admitted being involved in the robbery at the Knights' home and acknowledged that he had pleaded guilty to the offense. (*Id*. at 220). Kentrell's plea agreement was submitted as an exhibit, and Kentrell testified that, as part of the agreement, the prosecutor offered to recommend a favorable sentence for Kentrell to the Anthony Center for Youthful Offenders. (*Id*. at 222). Kentrell clarified, however, that the plea agreement did not require him to cooperate with the prosecutor. (*Id*.).

Kentrell testified that he had been friends with Gunn since high school and even lived with him occasionally, so he was quite familiar with the Knights' residence. (*Id*. at 222). Kentrell had stayed with Gunn at the Knights' home during the summer of 2014 and had seen a large sum of money in Gunn's safe. A few days before the robbery, Kentrell told his brother, Goodman, about the safe full of money. (*Id*. at 225-26). Goodman wanted to steal the money and started planning to get firearms to take with them to West Virginia. (*Id*. at 228-29). They recruited Wicker to drive Hess's car because he was the only one with a driver's license. When it came time to leave for West Virginia, Gibbs and Hill were present, so they came along. Kentrell recalled sitting in the passenger seat, and Goodman sat behind Wicker. (ECF No. 14-16 at 231). They arrived in Oak Hill around 8:00 a.m. and parked in a four-wheeler path behind the Knights' home. Kentrell testified that he and three others—everyone except Wicker, who had cerebral palsy and walked with a limp—went on foot from the vehicle to the Knights' home. Before leaving the car, Kentrell saw Gibbs and Hill get firearms from the trunk. (*Id*. at 234-35). When they reached the house, Gibbs and Hill went through the front door with their guns. Kentrell testified that he remained outside but went to the rear of the house, where Gunn's room was located, and witnessed a safe, some

shoes, a crossbow, and a shotgun being thrown out of Gunn's bedroom window. (ECF No. 14-16 at 238). They took the items back to the car, put them in the trunk, and drove back to South Carolina. (*Id.* at 240-242). Kentrell recalled that he sat in the front passenger seat, Wicker drove, and the other three sat in the backseat. (*Id.* at 243). Upon reaching Newbury at around noon or 1:00 p.m., the men went to Gibbs's residence, where they popped the safe by shooting it open. (*Id.* at 244-45). They found about $10,000 in the safe and divided it. They then took the safe to Aunt Benita's house and placed it behind a shed in order to get it out of Hess's vehicle. (*Id.* at 247-48). Kentrell testified that he confessed after the safe was found.

On cross-examination by Steele, Kentrell admitted that when the police first interviewed him, he stated that a guy with dreadlocks accompanied him, Goodman, and Hill to commit the robbery, although that was not true. (ECF No. 14-16 at 275-76). Kentrell explained that he was trying to cover for Rashod, who was scared. Kentrell also admitted that he told the police that Goodman had a gun when he urged Kentrell to go with him to rob Gunn, but denied saying that Goodman threatened him with the gun. (*Id.* at 276-77). Steele impeached Kentrell with his statement to the police. (*Id.* at 275-86). Steele pointed out how Kentrell's story changed over time, noting that Kentrell had implicated another individual in the crime who was actually innocent. (*Id.* at 279-81). Ultimately, Kentrell conceded that he was not entirely honest when he first spoke to the police but was honest with them at the end. (*Id.* at 302).

Ciliberti cross-examined Kentrell about his plea agreement, emphasizing that Kentrell had three out of four charges dismissed and was receiving a favorable sentencing recommendation from the prosecutor. (*Id.* at 294). Kentrell agreed that, under his plea deal, he would receive a maximum sentence of two years in the youthful

offender program followed by probation, rather than a sentence of ten years to life in prison. (ECF No. 14-16 at 294). Kentrell additionally admitted that, although he was not required to testify at the trial as part of the agreement, he had not yet been sentenced, and he believed his cooperation might have an impact on whether the judge accepted the sentencing recommendation. (*Id.* at 295-96). Ciliberti again reviewed the lies that Kentrell initially told the police when he was questioned about the robbery, and Kentrell concurred that he was not honest at first. (*Id.* at 302-05).

Rashod Wicker was the final witness called by the prosecutor. (ECF No. 14-17 at 6). Wicker confirmed that Benita was his mother and Kentrell and Goodman were his cousins. (*Id.* at 6-7). Wicker recalled that around midnight on the day of the robbery, Kentrell called him and asked him to drive Kentrell and some others to Hess's former house in West Virginia. (*Id.* at 8-9). When Wicker came to Aunt Benita's house about thirty minutes later, Kentrell and Goodman were there. Wicker, Kentrell, and Goodman got into Hess's Acura and then picked up the other two defendants. (*Id.* at 9). Wicker testified that he and Kentrell were sitting in the front seats, and the others were in the backseat. (*Id.* at 10). Wicker believed Goodman was sitting behind him because Goodman was tall, and Wicker was not. (ECF No. 14-17 at 12). According to Wicker, he learned that they were going to West Virginia to get some money, but he did not know from whom and did not see any firearms. (*Id.* at 11). When they arrived in Oak Hill, Wicker parked near a Domino's restaurant and they waited for the house to clear. (*Id.* at 14). After about five minutes, Goodman said, "let's go"; Wicker popped the trunk, and the four others left the vehicle. (*Id.* at 15-16). Wicker was told to stay in the car and wait. (*Id.* at 17). About 15 minutes later, the other four men came running back to the car, carrying a safe, shoes, and a crossbow. (*Id.* at 20). Everything was placed in

the trunk, and Wicker was told to get going, so they left. Wicker testified that the men talked about the robbery on the trip home and were unsure if they would get away with it because people were in the house. He recalled stopping at someone's home in West Virginia before returning to South Carolina, but Wicker did not get out of the car. (ECF No. 14-17 at 22). Once in Newberry, Wicker was dropped off at Aunt Benita's house, and the others left in the vehicle. (*Id.* at 24). Wicker later saw the opened safe at Aunt Benita's residence, although he did not know who brought it there. Kentrell gave Wicker $2000 a day after the robbery. (*Id.* at 25). Wicker testified that he pled guilty to first-degree armed robbery under a plea agreement, which was entered into evidence. (*Id.* at 26). The agreement did not require him to testify at trial, but he did promise to make a statement. (*Id.* at 27). Wicker admitted that the prosecutor agreed to recommend a sentence of six months to two years at a youth camp, followed by probation, rather than ten years to life in prison. (*Id.* at 37).

On cross-examination by Steele, Wicker acknowledged that he initially lied to the police when questioned about the robbery. (ECF No. 14-17 at 40-44). Wicker further testified that he was concerned about the amount of jail time he would get for his role in the crime and asked the police about the sentence when he was questioned. Wicker agreed that from the start, he hoped to get in "the least amount of trouble" from the crime as possible, as he did not want to spend time in prison. (*Id.* at 44). He stated that he was "on the stand" because he knew that taking the stand would give him the best possibility of getting the smallest punishment. (*Id.*). Ciliberti questioned Wicker further about the benefits of his plea agreement and about inconsistencies in his statement to the police versus his trial testimony. (*Id.* at 49-50, 56-59). Wicker agreed with most of Ciliberti's questions. (*Id.*).

Goodman began his defense by offering his girlfriend at the relevant time, Courtney Curry ("Curry"), as a witness. (ECF No. 14-17 at 82). Curry testified that early on the day of the robbery, she texted Kentrell's cellphone looking for Goodman. (*Id.* at 83). Hess responded that he had gone to West Virginia. Later in the morning, after Curry had put her son on the school bus, she went to the Chapin, South Carolina area to look for Goodman and found him there. (*Id.* at 85). Curry was angry because she thought Hess had lied to her and was covering for Goodman. She and Goodman spent the rest of the day at Aunt Benita's house until Curry's children came home on the bus. (*Id.* at 86). On cross-examination, the prosecutor pointed out inconsistencies between Curry's testimony and her statement to the police shortly after the robbery in which she stated that she was not sure about Goodman's whereabouts on the morning of January 9, 2015. (*Id.* at 91-96).

Goodman also testified on his own behalf. (ECF No. 14-17 at 107). He stated that he, his father, Aunt Benita, Curry, Kentrell, Wicker, and Goodman's other brother, Devon, were having a family get-together on the night of January 8, 2015, to celebrate Kentrell's recent move to Newberry. (*Id.* at 108). Curry left around 1:00 a.m., but Goodman stayed for another hour or two. Goodman was drunk and passed out on Aunt Benita's couch. When he awoke the following day, Hess told him that Curry was looking for him. (*Id.* at 109-10). Hess advised Goodman that she thought he had gone to West Virginia with Kentrell, so she had told Curry that Goodman was not there. (*Id.* at 110). Shortly after, Curry arrived at Aunt Benita's home, and Goodman left with her. They drove to a store, bought beer, and returned to Aunt Benita's home. (*Id.* at 111). Goodman denied playing any part in the crime, denied conspiring to rob Gunn, denied getting firearms to use in the crime, and denied going to West Virginia with the others.

14

(ECF No. 14-17 at 112-13). He recalled, however, that Kentrell purchased a futon, television, and Xbox after his trip to West Virginia. (*Id.* at 113). When asked why Kentrell would accuse him of being involved in the crime, Goodman explained that he was the only one of his siblings who did not live in West Virginia, so he did not have a close relationship with any of them. (*Id.* at 115-16).

On cross-examination, Goodman agreed that he knew all of the men allegedly involved in the robbery. (*Id.* at 118). The prosecutor emphasized that, if Goodman's story was true, four people other than Curry supposedly saw Goodman at Aunt Benita's home on the morning of January 9, 2015; however, Goodman did not bring any of those alibi witnesses to the trial. (*Id.* at 120-23). Furthermore, Goodman admitted that Hess came to trial and testified, and Goodman's lawyer could have asked her about Goodman's alibi, but he did not. (*Id.* at 121).

In closing argument, the prosecutor told to the jury that if the State's case was based solely on the statements of Kentrell and Wicker, the State would not have a good case. (ECF No. 14-17 at 221-22). He specifically criticized the testimony of Kentrell and Gunn, telling the jury that he did not find Gunn's testimony about seeing Goodman in the Knights' house to be credible. (*Id.* at 223). He told the jury to rely on physical evidence instead; for example, the spent shell casings, wadding, and safe particles in Gibbs's yard; the safe, crossbow, and shoes found at Aunt Benita's home; and the items purchased after the robbery. (*Id.* at 225, 228-31). He told the jury to believe Kentrell's testimony to the extent that it was corroborated by evidence, made sense, and was logical.

Steele argued that none of the physical evidence offered by the prosecutor implicated Goodman. (*Id.* at 245). None of the firearms, shotgun shells, wadding, or

15

other evidence had, in any way, been connected to Goodman. Steele reiterated the prosecutor's admission that Kentrell, Gunn, and Wicker were not credible. (ECF No. 14-17 at 245, 247). He noted that their stories had changed multiple times and were inconsistent with the victims' statements. Steele attacked Gunn's identification of Goodman as being one of the robbers, reminding the jury that Gunn initially identified other individuals as the perpetrators, including Goodman's father. (*Id.* at 247-48). Steele pointed out that none of the officers checked Goodman's alibi, even though he offered his alibi shortly after his arrest. (*Id.* at 249). Steele reviewed Curry's testimony, explaining why she was credible. He indicated that the prosecutor's suggestion that Goodman should have presented the other individuals who could support his alibi was meritless because Curry had testified and was highly believable; particularly when compared to the "documented liars" offered by the State. (*Id.* at 250). Steele advised the jury that Curry came of her own free will, without pay, which added to her credibility. Steele reminded the jury that the State's burden of proof was "beyond a reasonable doubt" and urged them to find doubt given that (1) no money, weapons, or evidence of any kind was found on Goodman, (2) he had a corroborated alibi; and (3) three days after the robbery, one of the victims accused Goodman's father—*not* Goodman—of the crime . (ECF No. 14-17 at 251-52).

Ciliberti added that the police did not take fingerprints from any of the stolen items found in South Carolina, even though fingerprint evidence had been around for decades. (*Id.* at 255). He also attacked the testimony of Kentrell and Wicker, emphasizing inconsistencies in their various statements and testimony. (*Id.* at 258). Counsel told the jury that Kentrell and Wicker pleaded guilty with the promise that the prosecutor would recommend they serve a relatively short sentence at a youthful

offender center. However, the sentence had not yet been imposed, so they testified with the sentencing still hanging over their heads. (ECF No. 14-17 at 257-58). Counsel went through the testimony of Kentrell and Wicker, highlighting how the testimony did not make sense and was contrary to other witness statements. (*Id*. at 258-63).

After two hours of deliberation, the jury found all of the defendants guilty on three counts. (*Id*. at 279-84). The Circuit Court scheduled sentencing hearings on November 9, 2015. (*Id*. at 286). Although Goodman requested probation, the Circuit Court sentenced him to a term of imprisonment of 52 to 65 years. (ECF No. 14-18).

Goodman filed a direct appeal of his conviction and sentence with the Supreme Court of Appeals of West Virginia ("WVSC"). He raised two challenges. (ECF No. 14-2). First, he claimed the Circuit Court erred by refusing his motion to sever the defendants' trials. Second, he asserted that the 50-year sentence he received for first-degree robbery was excessive and in violation of the West Virginia Constitution. The WVSC affirmed the Circuit Court judgment on March 9, 2017. (*Id*.). The WVSC rejected Goodman's arguments regarding his motion to sever, finding that the Circuit Court exercised reasonable discretion in denying the motion. Concerning Goodman's sentencing argument, the WVSC began the analysis by acknowledging the broad discretion of trial courts in West Virginia to determine sentences under the armed robbery statute, which provides that the court should impose a sentence of imprisonment between ten years and life. (ECF No. 14-2 at 31-32). Notwithstanding the statutory latitude, the WVSC applied both objective and subjective tests to assess whether the sentence was disproportionally long. (*Id*. at 32-33). After using the tests, the WVSC determined that Goodman's sentence was not disproportionate to the crime committed. (*Id*. at 37).

17

Goodman filed a petition for a writ of habeas corpus in the Circuit Court on December 5, 2017. (ECF No. 14-5). He amended the petition on February 11, 2019. (ECF No. 14-6). Goodman raised multiple grounds in support of his petition, including ineffective assistance of counsel, illegal search, Circuit Court abuse of discretion, prosecutorial misconduct, and cumulative errors. (*Id.*). As is relevant to the instant petition, Goodman specifically raised Steele's failure to offer video evidence from West Virginia turnpike toll booths, which he claimed conclusively showed that he was not present in the vehicle with the others on the day of the robbery. He also argued that his counsel was ineffective by failing to offer two cautionary jury instructions—known as a "*Humphrey's* instruction" and a "*Caudill* instruction." (*Id.*).

On August 27, 2019, the Circuit Court conducted an omnibus hearing on Goodman's habeas petition. (ECF No. 14-9). Steele appeared at the hearing upon Goodman's request. (*Id.* at 23). Steele testified that Goodman's case was the first criminal case he had taken to a jury trial, although he had been licensed to practice law for a number of years before then. (*Id.* at 24-25). Goodman's habeas counsel asked Steele about the video recordings from the turnpike toll booths. According to the record, when the men traveled in Hess's Acura to and from West Virginia on January 9, 2015, they passed through toll booths on the West Virginia turnpike—two going North and two going South. The turnpike toll booths had surveillance cameras that captured every vehicle passing through the toll booths, and the relevant video recordings from January 9, 2015 were obtained by the State and shared with the defendants during discovery. (*Id.* at 27).

Steele indicated that he received the recordings on four CDs and reviewed them, except for one that was corrupted. (*Id.*). Steele did not find the video recordings to

have any evidentiary value, because they did not show all of the occupants of Hess's vehicle. (ECF No. 14-9 at 29). Steele stated that he told Goodman about the video recordings and their lack of evidentiary value, but could not show Goodman the video recordings because Steele was not permitted to bring his laptop into the jail. (*Id.* at 29-30). Steele did not offer the video evidence at trial, because he felt it would only substantiate the prosecution's timeline. (*Id.*). Counsel handed Steele a photograph taken from one of the video recordings, and Steele remarked that he did not think he had seen the video recording from which the photograph was taken because the camera angle looked different. (*Id.* at 31). Steele agreed that the photograph may have come from video on the corrupted CD. (*Id.*). Steele testified that the photograph—unlike the video recordings—clearly showed that no one was sitting behind the driver's seat; thus, the photograph directly contradicted Wicker's testimony. (*Id.*). According to Steele, if he had seen the photograph, he would have introduced it into evidence because it supported Goodman's claim that he did not accompany the others to West Virginia. Moreover, it impugned the credibility of Kentrell and Wicker, who maintained that Goodman was in the car and sitting in the back of the vehicle behind the driver. (ECF No. 14-9 at 32-33). Steele described the photograph as "extremely valuable" to the defense. (*Id.* at 32).

As to the jury instructions, Steele testified that he was aware of the law in West Virginia that when a co-defendant pleaded guilty that plea could not be considered as incriminating evidence against the defendant on trial. (*Id.* at 33, 35). Steele admitted that he did not ask the Circuit Court for a limiting instruction (a "*Caudill* instruction") consistent with that law, however. (*Id.* at 35). Steele testified that he was also aware of the *State v. Bolling* case, which held that the Circuit Court was required to provide a

jury instruction, when requested, stating that the uncorroborated testimony of an accomplice should be received with caution (a "*Humphreys* instruction"*)*. (ECF No. 14-9 at 36). Steele indicated that he did not request such an instruction, and neither of these instructions were given by the Circuit Court. (*Id.* at 37). Steele confirmed that none of the defense attorneys requested the instructions pertaining to accomplice guilty pleas and testimony, although they would have been helpful. (*Id.* at 56). He admitted that there was no strategic reason for not requesting the instructions. (*Id.* at 40). Steele testified that he believes Goodman was not with the others and was actually innocent of the robbery. (*Id.* at 41).

On February 13, 2020, the Circuit Court entered an Order denying and dismissing the habeas petition. (ECF No. 14-10). The Circuit Court noted Goodman's contention that the turnpike toll booth video recordings—primarily the still photograph taken from a recording—were "strong exculpatory evidence and affirmative proof that [Goodman] was not involved in the crime as alleged by his co-defendants and other witnesses." (*Id.* at 22). The Circuit Court found, after closely and thoroughly reviewing "every segment of all of the videos", that "at very best, the video is inconclusive as to the rear occupancy of the subject vehicle and is of no significant exculpatory evidentiary value." (*Id.* at 22-23). The Circuit Court concluded that Goodman was simply "seeing what he wants to see" and placing "far more weight" on the video recordings and photograph than they warranted. (*Id.* at 23, 31). Given the absence of any testimony as to where Goodman sat on the ride back from West Virginia, which was when the still photograph was taken, and the vagueness of the video recordings and photograph, the Circuit Court found that counsel was not ineffective by failing to offer them as evidence. (*Id.* at 31-32). Furthermore, the Circuit

Court concluded that even if the video recordings and photograph had been used at trial, Goodman had failed to establish a reasonable probability that the jury would not have convicted him based on the video evidence. (ECF No. 14-10 at 32).

The Circuit Court also considered whether counsel was ineffective by failing to offer the *Caudill* limiting instruction and the *Humphreys* cautionary instruction. (*Id.* at 25- 28, 32-39). Beginning with the *Humphreys* instruction, the Circuit Court found that counsel was not ineffective by failing to offer a cautionary instruction because such an instruction was only mandated when the accomplice's testimony was uncorroborated. In Goodman's case, the testimony was corroborated; as such, no instruction was warranted. (*Id.* at 33).

In regard to the *Caudill* limiting instruction, the Circuit Court assumed, without deciding, that Steele was ineffective when he failed to request the instruction. However, the Circuit Court concluded that Goodman could not satisfy the prejudice prong of an ineffective of assistance of counsel claim, as defense counsel made the plea agreements, their benefits and incentives, a "center point" of the case by attacking the credibility of both Kentrell and Wicker. (ECF No. 14-10 at 36-37). Indeed, in opening statements, closing arguments, and cross-examination, defense counsel "consistently and fervently" contended that Kentrell and Wicker only pleaded guilty and implicated the others in an attempt to gain the best plea deal they could, while at the same time protecting the actual perpetrators of the crime. (*Id.* at 37). The Circuit Court noted that all three defendants took the witness stand and expressly refuted the testimony of Kentrell and Wicker, giving the jury a full opportunity to compare the testimony and assess the credibility of the witnesses. (*Id.* at 38). Accordingly, the Circuit Court found it highly unlikely that the jurors would have been confused and considered the guilty

pleas of Kentrell and Wicker as evidence of guilt on the part of Goodman, Gibbs, and Hill. (ECF No. 14-10 at 38). The Circuit Court found that the instructions given provided the jury with considerable guidance on assessing credibility and, in summary, Goodman could not make the requisite showing of prejudice that, but for counsel's failure to request the instruction, the outcome of his trial would have been different. (*Id.* at 39).

Goodman appealed the Circuit Court's denial of his habeas petition to the WVSC. On June 8, 2022, the WVSC affirmed the Circuit Court's ruling. (ECF No. 14-14). The WVSC addressed the toll booth video recordings; particularly, the still photograph that Goodman contended was exculpatory because it reflected an empty backseat where Kentrell and Wicker testified Goodman was sitting. (*Id.* at 15). The WVSC examined the video recordings and photograph and reviewed the Circuit Court's findings. Applying a clearly erroneous standard to the Circuit Court's factual findings, the WVSC determined that there was "nothing in the videos to support a finding that the circuit court clearly erred in its findings." (*Id.* at 15). The WVSC agreed that the video recordings and photograph were indiscernible, "do not reveal the backseat occupancy as Mr. Goodman argues," and offered little exculpatory value. (*Id.* at 15). Consequently, trial counsel was not ineffective when he made a reasonable strategic decision not to introduce them as evidence. (*Id.* at 16).

Next, the WVSC considered trial counsel's failure to request *Humphreys* and *Caudill* instructions. (*Id.* at 17). The WVSC noted that the Circuit Court had assumed ineffectiveness for purposes of analyzing the lack of a *Caudill* instruction. The WVSC indicated that simply because trial counsel believed in hindsight he might have erred, that was not sufficient to establish ineffectiveness, which was based on an objective

22

standard. (ECF No. 14-14 at 18-19). Considering the deficiency prong of the claim, the WVSC concluded that a reasonable lawyer in Steele's position may have made the decision not to request a *Caudill* instruction and, since Steele "made a calculated decision by a reasonable lawyer standard, he acted within the broad range of acceptable professional conduct." (*Id*. at 22).

With respect to the *Humphreys* instruction, the WVSC agreed with the Circuit Court that other evidence corroborated the testimony of Kentrell and Wicker, rendering counsel's decision not to request the instruction reasonable. (*Id*. at 23). Moreover, the WVSC found that defense counsel requested a credibility instruction that was given, and that the instruction provided the jury with guidance on assessing the validity of witness testimony. The WVSC determined that the adversarial process worked adequately, explaining that "a decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." (*Id*. at 23-24) (internal markings and citation omitted).

## II.    Section 2254 Petition, Motion to Dismiss and for Summary Judgment, and Response

Goodman placed the instant petition in the prison mailing system on February 6, 2023. (ECF No. 2 at 5). He raises the following three grounds for relief:

1.    Ineffective assistance of counsel. Goodman argues that Steele was deficient by failing to thoroughly review all four of the turnpike toll booth video recordings, because a segment  on the video that Steele described as "corrupted" showed only three people were in Hess's vehicle on the day of the robbery, supporting Goodman's claim that he did not accompany the co-defendants to West Virginia. (*Id*.

23

at 5).

2.      Ineffective assistance of counsel. Goodman contends that Steele was deficient by failing to offer *Caudill* and *Humphreys* instructions, creating a jury that "did not know the law." (ECF No. 2 at 7).

3.      Actual innocence. Goodman claims that he was in another State at the time of the robbery. (*Id.* at 8). He adds that counsel failed to subpoena witnesses that could have corroborated his alibi, which he describes as "part of" his claim that counsel failed to investigate—the claim he raised in relation to the video recordings and photograph. (*Id.* at 8). Of note, Goodman raised an "actual innocence" claim in the state habeas action, but did not identify as a ground for relief, nor develop with facts or law, the supporting allegation that counsel failed to subpoena key witnesses. Instead, Goodman has used that allegation as an argument to bolster his innocence claim and support his claim regarding the video recordings. (*Id.*).

In a supporting memorandum, Goodman contends that Steele must not have watched the video recordings carefully or fully because the still photograph showing only one person in the backseat of Hess's vehicle came from the video recordings, which Steele received in discovery. (ECF No. 3 at 12). Goodman argues that the state courts' conclusion that Steele made a strategic decision not to offer the video evidence is flawed, as Steele could not have made a strategic decision about evidence he never saw or considered. (*Id.*). Goodman disagrees with the state courts' finding that the video recordings and photograph offer little exculpatory value, noting that both the prosecutor and Steele agreed that the photograph shows only one person in the backseat. (*Id.*).

Goodman asserts that Steele's failure to request the limiting and cautionary

instructions was also ineffective as the jurors should have been warned about the motives of witnesses who were paid to inculpate other individuals. (ECF No. 3 at 16). Goodman stresses that Steele admittedly had no strategic reason for failing to offer the instructions, even though the instructions clearly were warranted given the lack of corroborating evidence against Goodman. (*Id.* at 17).

Goodman maintains that the errors by his counsel were plainly prejudicial because, cumulatively, they prevented him from getting a fair trial. (*Id.* at 19). Without the photograph, the jury had incomplete evidence upon which to determine Goodman's guilt; in the absence of proper jury instructions, the jury was allowed to give the accomplice testimony greater weight than it deserved. (*Id.* at 19-20). According to Goodman, under the circumstances, the only way to rectify the errors is to reverse the convictions and vacate the sentences. (*Id.* at 20). Therefore, Goodman requests that his convictions be reversed, his sentences be vacated, and the matter be remanded to the state court for a new trial or dismissal. (ECF No. 2 at 15).

Respondent filed a Motion and Amended Motion to Dismiss to Petition for a Writ of Habeas Corpus and for Summary Judgment on June 5, 2023. (ECF Nos. 12, 13). In an accompanying memorandum, Respondent argues that Goodman's actual innocence ground should be summarily dismissed, because "[f]reestanding claims of actual innocence are not usually recognized in federal habeas actions." (ECF No. 14 at 11) (citation omitted). Respondent asserts that Goodman has not demonstrated a basis for this Court to consider an actual innocence claim. (*Id.*).

Respondent contends that Goodman's ineffective assistance claims require a two-pronged showing: one of deficient performance and one of prejudice. (*Id.* at 12). When a federal court reviews a claim of ineffective assistance of counsel, the standard

of review is doubly deferential as the question is not whether the petitioner could satisfy the two-pronged test in the first instance, but rather, whether the state court was objectively unreasonable in applying the test to the facts of the case. (ECF No. 14 at 15). Respondent contends that both the Circuit Court and the WVSC reviewed the toll booth video recordings and the still photograph and both concluded that they had little exculpatory value. Consequently, Steele's decision not to offer them as evidence was not ineffective or prejudicial to Goodman. (*Id*. at 16).

Similarly, according to Respondent, the state courts were not erroneous or unreasonable in finding that Steele's representation was not deficient when he failed to request *Caudill* and *Humphreys* instructions. (*Id*. at 17-18). Respondent argues that a *Humphreys* instruction was not warranted as the testimony of Kentrell and Wicker was corroborated, and counsel made a calculated decision not to offer a *Caudill* instruction, which fell within the broad range of reasonable representation. (*Id*.). Moreover, Respondent asserts, Goodman cannot satisfy the prejudice prong of the test because he has not demonstrated a reasonable probability that the outcome of the trial would have been different if the instructions were offered. (*Id*.)

Goodman responded to Respondent's dispositive motions, strenuously disagreeing with Respondent's description of the toll booth films. (ECF No. 20 at 5-6). Goodman argues that the still photograph from the video recordings so clearly shows that he was not in the car that, but for his counsel's unprofessional errors, the results of the proceedings would have been different. Goodman disputes that Steele made a tactical decision when he failed to offer the video recordings, instead asserting that Steele simply failed to thoroughly review and investigate the video. (*Id*. at 8-9). Goodman adds that Steele did not fully investigate the accomplices' confessions, nor

26

did he contact the other alibi witnesses in South Carolina. (ECF No. 20 at 11). Goodman accuses Steele of simply relying on the police officers' reports without questioning their validity. He argues that Steele's failure to offer the video recordings, contact and present additional alibi witnesses, and demand the proper jury instructions in combination establish more than a reasonable probability that his trial would have ended differently. (*Id.* at 14-15).

### III.    <u>Standard of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in state custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

> (1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary, 28 U.S.C. § 2254(e)(1). The burden of proof in a habeas action rests with the petitioner. *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011)

(citing *Woodford v. Visciotti,* 537 U.S. 19, 25 (2002)). Accordingly, to succeed on a habeas petition, the petitioner must meet a difficult standard—one "which demands that state-court decisions be given the benefit of the doubt." *Woodford,* 537 U.S. at 24. Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams*, 529 U.S. at 405) (internal quotations omitted). The district court may grant a habeas writ under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300–01 (internal marks omitted).

Accordingly, the AEDPA limits the federal habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be

unreasonable." *Williams*, 529 U.S. at 365. "A state court's decision is unreasonable where it is 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Valentino v. Clarke*, 972 F.3d 560, 580 (4th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Here, Respondent moves for summary judgment. (ECF Nos. 26, 48). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465

(4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party, as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249–50).

## IV.    <u>Discussion</u>

To properly review the decision of a state court in a § 2254 petition, this court must consider the factual determinations and reasoning that are being challenged. The Circuit Court conducted an omnibus evidentiary hearing and gathered testimony before rendering its opinion denying Goodman's habeas claims, an opinion later adopted and supplemented by the WVSC. Goodman was represented by postconviction counsel and given every opportunity to flesh-out and factually support his case for habeas relief. Therefore, Goodman must surmount the extremely high bar of showing that the state court decisions he challenges were unreasonable. *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) ("Where the state court conducted an evidentiary hearing

and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part."). In the context of a § 2254 petition, a constitutional error will warrant relief only if the error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

## A.  Ineffective Assistance of Counsel—Grounds One and Two

In the first two grounds of his petition, Goodman asserts that his constitutional rights were violated because his counsel was ineffective. (ECF No. 2 at 5, 7). The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687-88, 694.

When assessing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Review of trial counsel's investigation is considered from counsel's perspective at the time, as well as the professional norms then prevailing. *United States v. Higgs*, 663 F.3d 726, 739 (4th Cir.

2011). Trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th. Cir. 1995). Courts will not second-guess an attorney's tactical decisions unless they appear unreasonable in view of all the circumstances. *Goodson v. United States*, 564 F.2d 1071, 1072 (4th. Cir. 1977). Accordingly, "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla*, 559 U.S. at 371.

As Goodman raises his claims of ineffective assistance of counsel in a § 2254 petition, his claims must overcome both the *Strickland* standard and the barrier imposed by § 2254(d), resulting in review that is "doubly" deferential to the decision of the state court. *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009). In *Harrington v. Richter*, the Supreme Court made clear that relief in these circumstances should be granted only sparingly. 562 U.S. at 102. The *Harrington* court clarified that the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 101. This standard of review recognizes that for the "purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id.* (quoting *Williams*, 529 U.S. at 410). "If this standard is difficult to meet, that is because it was meant to be." *Harrington,* 562 U.S. at 102. Habeas review under § 2254(d) is intended to function as a "guard against extreme malfunction in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-103.

### 1. Failure to Fully Review and Offer Video Evidence

The state courts concluded that the video recordings and still photograph were indiscernible; thus, not sufficiently distinct to determine the rear occupancy of Hess's

vehicle. As previously stated, this Court must presume that factual determinations made by the state court are correct unless Goodman offers clear and convincing evidence to rebut the presumption. Goodman offers the still photograph taken from the toll booth video recordings, the video recordings, and the various perceptions of individuals as to what is reflected in the images. The undersigned, like the two state courts, examined the video recordings and the still photograph very carefully, reviewing each video recording multiple times, segment by segment, and as recorded by the turnpike toll booth cameras. Contrary to what is described by Goodman, the undersigned does not see a clear picture that shows how many individuals are sitting in the backseat of Hess's vehicle. Indeed, while Goodman claims the photograph shows only one person in the backseat, the undersigned sees what appears to be shapes and movements of three people in the backseat as the vehicle reverses and then pulls forward in a related video recording. (*see* ECF No. 14-24 at 1:47 to 1:50). Having examined this evidence, the undersigned **FINDS** that the images captured on the video recordings and still photograph, as they pertain to the rear occupancy of the vehicle, are not so unequivocal that they rebut the factual determinations of the state courts. Consequently, the undersigned further **FINDS** that this genuine difference of perception as to what is captured on the video recordings prevents Goodman from satisfying his clear and convincing burden of proof and mandates that this Court accept the factual determination of the state courts, which is that the video recordings and photograph are not sufficiently clear to exculpate Goodman.

Next, this Court examines whether the state court determination on Goodman's claim of ineffective assistance of counsel was contrary to, or involved an unreasonable application of clearly established federal law. Goodman alleged that Steele provided

ineffective assistance of counsel when he failed to thoroughly and completely review the turnpike toll booth video recordings and then offer the exculpatory segments into evidence. Initially, Goodman believed that the still photograph—which he claims is exculpatory—must have been in the video recording contained on the corrupted CD received by Steele, because Steele did not recognize the photograph when it was shown to him at the omnibus hearing on Goodman's state habeas petition. Goodman was critical that Steele failed to obtain a replacement CD for the corrupted one. However, Steele later conceded that he did possess a good copy of the video recording from which the photograph was excerpted. After learning that Steele had the relevant video recording, Goodman speculated that Steele must not have carefully examined the video recordings, or he would have seen the exculpatory segment. Goodman accuses Steele of being deficient for not offering that video recording to the jury.

At the omnibus hearing, Steele testified that he reviewed all of the available video recordings and did not find them to be of any evidentiary value because they did not clearly show the individuals in the vehicle. Additionally, he was concerned that the recordings would merely strengthen the prosecutor's case by corroborating the timeline of the robbery. Steele discussed his review of the video recordings and his conclusions with Goodman.

The Circuit Court rejected Goodman's ineffective assistance of counsel claim related to the recordings on the basis that: (1) the recordings were "at best ... inconclusive at the occupancy of the subject vehicle and are of no significant exculpatory value," (2) Goodman could not establish that Steele was ineffective for failing to offer evidence that was not exculpatory and that was arguably inculpatory, and (3) considering the nature and value of the video evidence, Goodman could not

establish by a reasonable probability that the jury would not have convicted Goodman if this video evidence had been introduced. (ECF No. 14-10 at 31-32). The WVSC agreed, stating that "[s]ince the videos had little exculpatory value, trial counsel made a reasonable, strategic decision not to introduce them into evidence." (ECF No. 14-14 at 16). The WVSC added that the videos placed the Hess vehicle in West Virginia, contained time stamps matching the robbery timeline, and supported the prosecutor's claim that the group traveled back to South Carolina after the crime. (*Id.*). By not offering the video evidence, "which may have been more harmful than beneficial, trial counsel's decision can be attributed to sound trial strategy." (*Id.*).

The undersigned **FINDS** that the determination of the state court was not contrary to or an unreasonable application of clearly established federal law. Goodman's allegation that Steele did not thoroughly review the video evidence is merely speculation. It is equally plausible that Steele did not recognize the image on the photograph at the habeas hearing, because it had been four years since Goodman's trial, memories fade, and in 2015, the evidence was not captured in the form of a still photograph. Moreover, Steele testified that the photograph provided by habeas counsel was much clearer than any view he had observed on the video recordings. Goodman and his habeas counsel directed Steele's attention to what they believed was an empty seat behind the driver of Hess's vehicle. The Circuit Court concluded that Goodman and counsel saw what they wanted to see, and Steele, who professed his belief in Goodman's innocence, may have been just as inclined to see what *they* wanted *him* to see.

In any event, Steele's performance must be judged at the time he prepared and tried the case, not in hindsight. *Owens v. Sterling,* 967 F.3d 396, 412 (4th Cir. 2020)

(Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence," and "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission ... was unreasonable," *Strickland* cautions that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time.") (quoting *Strickland,* 466 U.S. at 689). Steele testified that he reviewed the video recordings and found them of no value to his defense. He was also concerned that they would help the prosecution by corroborating the robbery timeline. "Decisions about what types of evidence to introduce are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (quotation marks and citations omitted). The decision to forgo evidence that was potentially damaging to the defense—particularly when it was assessed to be of little value to the case—was a supremely reasonable trial strategy and fell well within the broad range of effective assistance of counsel. Accordingly, the undersigned **FINDS** that the state court determination that Steele was not ineffective is not contrary to or an unreasonable application of clearly established federal law.

Moreover, the video evidence simply does not establish how many individuals were in Hess's vehicle. Given the shadows, the glare from toll booth lighting, the weather conditions, and the opaqueness of the vehicle's rear windows, the jurors would have been left to imagine how many men occupied the vehicle and exactly who the men were in the car. All three defendants testified at trial that they were not in the vehicle. (ECF No. 14-17 at 108-113, 140-141, 147-148). Even when accepting Goodman's

36

description of the video evidence as showing that there is only one, or perhaps two, people in the backseat of Hess's vehicle, that still allows the jury to reasonably conclude that Goodman was a passenger in the car. Consequently, the undersigned **FINDS** that the state court determination that Goodman failed to satisfy his burden to show prejudice is not contrary to or an unreasonable application of clearly established federal law.

### 2.  *Failure to Request Caudill and Humphreys Instructions*

Goodman's second ground for relief is another ineffective assistance of counsel claim, related to jury instructions. (ECF No. 2 at 7). Goodman asserts that Steele was constitutionally deficient for failing to request two jury instructions: a *Caudill* instruction and a *Humphreys* instruction. (*Id.*). A *Caudill* instruction is a limiting instruction which informs the jury that, when a defendant's accomplice testifies about their own guilty plea, the accomplice's guilty plea can only be used to assess the credibility of the accomplice's testimony and cannot be used to prove the defendant's guilt. *State v. Caudill*, 170 W. Va. 74 (1982). A *Humphreys* instruction advises the jury that the uncorroborated testimony of an accomplice should be received with caution. *State v. Humphreys*, 128 W. Va. 370 (1945).

Two of Goodman's accomplices testified against him at trial: Kentrell and Wicker. (ECF No. 14 at 5). As previously indicated, both Kentrell and Wicker had pleaded guilty to first-degree robbery, with the remaining charges dismissed. (*Id.* at 4–5). The guilty pleas were discussed repeatedly at trial, and the plea agreements were entered into evidence. (ECF No. 14-17 at 60). At the state habeas omnibus hearing, Steele testified that there was no conceivable strategic reason to not ask for the instructions. (*Id.* at 40). Because Goodman was tried alongside two co-defendants, two

other defense attorneys were present at trial—both experienced criminal defense attorneys. (*Id.* at 53–54). Steele stated that he and the other two attorneys had discussed possible jury instructions beforehand, but did not state whether the attorneys discussed *Caudill* and *Humphreys* instructions. (*Id.* at 56). Ultimately, none of the attorneys requested a *Caudill* or *Humphreys* instruction, (*id.* at 55–56), and the jury did not receive either instruction. (*See* ECF No. 14-17 at 197–217).

On review of Goodman's state habeas petition, the WVSC concluded that Goodman had failed to prove the first prong of the *Strickland* test, finding that Steele acted reasonably in declining to request either a *Caudill* or *Humphreys* instruction. *Goodman v. Searls*, 247 W. Va. 596, 605–06 (2022). Although Steele testified at the omnibus hearing that there was no conceivable strategic reason for not requesting the instructions, WVSC stated that the *Strickland* performance inquiry is objective, not subjective. A trial lawyer's own belief that he made a mistake does not establish that **no** reasonable lawyer would have made the same decision. *Id.* at 604. In evaluating Steele's performance with respect to the *Caudill* instruction, the WVSC referenced its prior decision in *State v. Flack*, 232 W. Va. 708 (2013), in which it held that a court need not provide a *Caudill* instruction of its own initiative, because it may be a sound defense strategy to avoid drawing the jury's attention to the accomplice testimony with the limiting instruction. *Id.* at 605. The WVSC determined that, in Goodman's case, a reasonable lawyer in Steele's position would have to weigh the potential benefit of a *Caudill* instruction against its detriment, and a reasonable attorney could have decided to move past the damaging testimony as quickly as possible. *Id.* at 605–606. The WVSC concluded, since Steele "made a calculated decision by a reasonable lawyer standard, he acted within a broad range of acceptable professional conduct." *Id.* at

606. Regarding the *Humphreys* instruction, the WVSC found that a *Humphreys* instruction would have been inappropriate, because the accomplice testimony offered at trial was corroborated. *Id.* Thus, the WVSC concluded that Steele acted reasonably in choosing not to request an unwarranted instruction. *Id.*

Because the WVSC rendered a decision on the merits of Goodman's claim, the undersigned must first evaluate the reasonableness of that decision. As indicated, 28 U.S.C. § 2254 (d) provides that a federal court may not grant federal habeas relief unless the state court's determination on the merits resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) was based on an unreasonable determination of the facts. If the state court's judgment was unreasonable per § 2254(d), then the federal court may review the petitioner's habeas claim *de novo*. *See Austin v. Plumley*, 565 Fed. Appx. 175, 184 (4th Cir. 2014). Regarding the performance-prong of *Strickland*, the undersigned **FINDS** that the WVSC's decision was based on an unreasonable determination of the facts.

At the state habeas omnibus hearing, Steele testified that there was no conceivable strategic reason for his failure to request the *Caudill* and *Humphreys* instructions. (ECF No. 14-9 at 40). The WVSC interpreted this to mean that Steele had made a "calculated decision" not to request the jury instructions, *Goodman*, 247 W.Va. at 606, and that, in hindsight, Steele believed this decision to be a mistake. *Id.* at 605. However, Steele offered no reason for failing to request the instructions and could think of no reason why they were not requested, although he agreed that having the Circuit Court give those instructions to the jury was "crucial stuff" for a defense attorney. (ECF No. 14-9 at 56). Thus, the WVSC's finding is contradicted by Steele's testimony, and the record is devoid of testimony or other evidence indicating that

Steele made a "calculated decision" not to offer the instructions. *See Ruiz v. United States,* 146 F. Supp. 3d 726, 730 (D. Md. 2015) (finding that trial counsel's failure to challenge a jury instruction could not be treated as a strategic decision where trial counsel admitted there was "no strategic reason" for failing to challenge the instruction). In the absence of any record evidence sustaining the WVSC's conclusion, this amounts to an unreasonable determination of the facts. *See Allen v. Stephan*, 42 F.4th 223, 254 (4th Cir. 2022), *cert. denied sub nom. Chestnut v. Allen*, 143 S. Ct. 2517 (2023) (holding that a state court's decision was based on unreasonable determination of fact where it was based on "a factual finding that is plainly contradicted by the record."); *Gray v. Zook*, 806 F.3d 783, 790 (4th Cir. 2015) ("An unreasonable determination of the facts is not merely an incorrect determination, but one sufficiently against the weight of the evidence that it is objectively unreasonable.") (internal citations omitted). The WVSC's decision was "based on" this unreasonable determination of the facts, as the WVSC's *Strickland* analysis depended largely upon its conclusion that Steele had intentionally chosen not to request the *Caudill* and *Humphreys* instructions. Because the WVSC's decision was based on an unreasonable determination of the facts, the undersigned proceeds to review *de novo* Goodman's ineffective assistance of counsel claim related to the failure to request the jury instructions.

Turning first to the *Humphreys* instruction, Steele's failure to request this instruction does not amount to ineffective assistance of counsel. A *Humphreys* instruction is only appropriate where uncorroborated accomplice testimony is offered at trial. The WVSC determined that Wicker's and Kentrell's testimonies were corroborated, and so the instruction was inapplicable. *Goodman,* 247 W.Va. at 606.

Justice Wooten argued in his dissenting opinion that the majority's conclusion was incorrect based on West Virginia's definition of corroborating evidence, *id.* at 610, but "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The undersigned must defer to the WVSC's determination that the *Humphreys* instruction was not warranted. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983) ("[T]he views of the state's highest court with respect to state law are binding on the federal courts."); *see also Taylor v. Warden*, No. 2:13-2213-RMG-WWD, 2014 WL 4716443, at *6 (D.S.C., Aug. 1, 2014), *report and recommendation adopted as modified*, No. 2:13-CV-2213-RMG, 2014 WL 4721183 (D.S.C., Sept. 22, 2014) (accepting state court's determination that, under state law, the requested jury instruction was inapplicable). Because the *Humphreys* instruction was inapplicable, the undersigned **FINDS** that Steele's failure to request the instruction did not undermine the reliability of the trial. Therefore, Goodman's ineffective assistance claim regarding the *Humphreys* instruction must fail.

Turning to the *Caudill* instruction, as the Circuit Court pointed out, it is unnecessary to consider whether Steele's performance was deficient, because Goodman cannot show prejudice. *See Strickland*, 466 U.S. at 697 (stating that a court may dispose of an ineffective assistance claim by evaluating the prejudice prong without evaluating counsel's performance). To demonstrate prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one which undermines confidence in the outcome of the trial. *Id.* Goodman has not satisfied this standard.

Because a *Caudill* instruction is a limiting instruction to the jury that an accomplice's guilty plea cannot be taken as substantive evidence of the defendant's guilt, the potential impact of a *Caudill* instruction depends on the extent and purpose to which those guilty pleas were used at trial. Kentrell's and Wicker's plea agreements were mentioned repeatedly throughout the trial, but they were primarily discussed as evidence of the men's motives for testifying and their credibility as witnesses. In other jurisdictions where similar instructions are available, courts have determined that no prejudice resulted from the failure to provide a limiting instruction where the accomplice's guilty plea was not used as evidence of the defendant's guilt. *See United States v. Browne,* 767 Fed. Appx. 251, 254 (3d Cir. 2019) ("The government did not exploit the plea to prove [the defendant's] guilt."); *United States v. Price*, No. 4:06-CR-0053-1, 2012 WL 3027844, at *4 (M.D. Pa., July 24, 2012) ("Although the government did not provide an explicit reason for introducing the co-defendants' guilty pleas, at no point did it suggest that those pleas were indicative of [the defendant's] guilt).

The state elicited testimony that neither Kentrell nor Wicker were required to testify per their plea agreements, and that they were testifying of their own free well. (ECF Nos. 14-16 at 222; 14-17 at 27–28). The defense attorneys elicited testimony that, in exchange for Kentrell's and Wicker's pleas, the prosecutor was dismissing three of the four charges against them and recommending very favorable sentences—two years maximum in a youth camp followed by probation instead of ten years to life in prison. (ECF Nos. 14-16 at 261–62, 14-17 at 37, 49–50). The prosecutor also referenced the plea agreements in his closing argument, to remind the jury that Kentrell and Wicker were not required to testify, and to advise the jury that their role was to determine guilt, without regard to the potential punishment. (ECF No. 14-17 at 273–74).

Kentrell's and Wicker's testimonies were primarily focused on their own accounts of the crime, not on their guilty pleas. There was no suggestion that the guilty pleas entered by Kentrell and Wicker should be considered as evidence of the defendants' guilt. Given the record, the undersigned **FINDS** that there is minimal concern that the jury misunderstood the purpose of the guilty pleas, where both the prosecution and defense consistently referenced them as measures of Wicker's and Kentrell's credibility and not as evidence of Goodman's guilt. This conclusion echoes that of the Circuit Court's ruling on Goodman's state habeas petition:

> [T]he plea agreements, and the benefit gained thereby, [were] at the heart of defense counsels' argument, and based on defense counsels' theory of the case and the argument presented to the jury, the Court finds it highly unlikely that there was any confusion by the jury regarding whether Rashod Wicker's and Kentrell Goodman's pleas could be taken as proof of the guilt of the Petitioner, Gibbs, or Hill.

(ECF No. 14-10 at 38). Goodman has not shown there is a reasonable probability that, but for counsel's alleged failure to request a *Caudill* instruction, the outcome of the proceeding would have been different. Accordingly, the undersigned **FINDS** Goodman's ineffective assistance of counsel claims related to the failure to request *Caudill* and *Humphreys* instructions are without merit.

### B. Actual Innocence—Ground Three

Goodman's third ground for relief asserts an actual innocence claim. (ECF No. 2 at 8). Goodman's claim appears to be a freestanding claim—in other words, a claim of actual innocence separate from any other constitutional violations. The Supreme Court has not held that actual innocence, by itself, is a ground for federal habeas relief. *See Herrera v. Collins*, 506 U.S. 390 (1993). Rather, the Supreme Court has all but foreclosed such claims, except in capital cases. Even assuming such a freestanding

43

claim of actual innocence were cognizable, the threshold to sustain such a claim would be "extraordinarily high." *Id.* at 401.

The Supreme Court has made clear that while actual innocence typically is not itself a constitutional claim, it is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits." *Herrera,* 506 U.S. at 404. Goodman attempts to invoke the "innocence gateway" in his Response to Respondent's Motion to Dismiss, (ECF No. 20 at 5–6), but he misunderstands its purpose. The innocence gateway, also known as the "fundamental miscarriage of justice" exception, permits a federal court to review claims that would otherwise be unreviewable due to procedural default. *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995). To use the innocence gateway, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," (*id*. at 324), and show that constitutional errors "probably resulted" in the conviction of one who is actually innocent—in other words, "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id*. at 327. Because Goodman has not alleged that any ground in his instant petition was procedurally defaulted, and he presented no new evidence so convincing of his innocence that **no** juror acting reasonably would have convicted him, the innocence gateway does not apply.

The only evidence Goodman presents in his petition that was not offered at trial are the toll booth video recordings and photograph. As discussed above, this evidence has little exculpatory value—the video recordings and photograph do not clearly show that Goodman was absent from the car. As the Circuit Court stated, "at best, the videos

are inconclusive as to the occupancy of the subject vehicle," due to the camera's position, window tinting, glare, environmental conditions, and the perpetrators' dark clothing and posture. (ECF No. 14-10 at 31). While the still image is higher quality than the video recordings, the contents of the backseat remain obscured from view, because the backseat window was reflecting light from around and inside the toll booth. (ECF No. 14-21). It cannot be said that, with this additional evidence, it is more likely than not that no reasonable juror would have convicted Goodman. Clearly, if Goodman has not met the lower innocence gateway standard, he has not met the extraordinarily high burden that the Supreme Court has described for a rare freestanding innocence claim. Accordingly, the undersigned **FINDS** that Goodman fails to state an cognizable actual innocence claim.

To the extent Goodman is attempting to raise an ineffective assistance of counsel claim based upon Steele's failure to subpoena witnesses from South Carolina, further investigate Goodman's alibi, or any of the other litany of deficiencies he raises in his Response and Objections to Defendant's Motion to Dismiss and Motion for Summary Judgment, (ECF No. 20 at 11-15), the undersigned **FINDS** that these claims are not properly before the Court. Goodman raises these criticisms, in large part, to support his claim of actual innocence. However, arguing these points to bolster his other grounds for relief does not transform them into grounds of their own. "Numerous courts have held that a ground for relief not asserted in either an original or amended petition need not be considered by the court." *Gaultney v. Ballard,* 1:09-cv-01221, 2012 WL 6044412, at *2 (S.D.W. Va. Dec. 5, 2012) (collecting cases); *see also Boyles v. Bowser*, No. 2:17-CV-01839-MO, 2022 WL 939824, at *6 (D. Or. Mar. 29, 2022) ("The Court also recognizes that Petitioner's supporting memorandum can be

construed to contain argument to support a variety of claims that are not raised within the Petition. These claims, improperly raised in Petitioner's Amended Memorandum (#60), are not properly before the court for its consideration.") (citing Rule 2(c), Rules Governing Section 2254 Proceedings, 28 U.S.C. foll. § 2254 (requiring each habeas petition to "specify all the grounds for relief which are available to the petitioner"); *Sulfridge v. Warden*, No. 219CV00602JRSDLP, 2020 WL 6135685, at *2 (S.D. Ind. Oct. 19, 2020) (holding that "new grounds for relief, not raised in the habeas corpus petition, may not be raised for the first time in reply.").

In any event, while counsel "has a duty to make reasonable investigations. ... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "To prevail on an [ineffective assistance of counsel] claim based on a failure to investigate, a petitioner must specify 'what an adequate investigation would have revealed.'" *Walton v. Ballard*, No. 2:15-CV-11423, 2018 WL 1582737, at *7 (S.D.W. Va. Mar. 30, 2018), *appeal dismissed*, 738 Fed. Appx. 159 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2743 (2019) (quoting *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990)). "An allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out." *Campbell v. United States*, No. 5:07-cv-0120, 2009 WL 6327477, at *11 (S.D.W. Va. Nov. 6, 2009) (citations omitted), *report and recommendation adopted*, No. CIVA 5:07-0120, 2010 WL 1379992 (S.D.W. Va. Mar. 31, 2010).

"The decision whether to call a defense witness is the epitome of a strategic decision that demands the assessment and balancing of perceived benefits against

perceived risks and is afforded 'enormous deference.'" *Thorne v. United States*, No. 3:13-CR-293-MOC-1, 2020 WL 3513707, at *11 (W.D.N.C. June 29, 2020) (quoting *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004)). Accordingly, courts are generally "reluctant to find ineffective assistance based upon complaints regarding uncalled witnesses." *Lenz v. True*, 370 F. Supp. 2d 446, 479 (W.D. Va.2005). A petitioner is usually unable to show that "he was prejudiced by the absence of a witness' testimony unless he demonstrates 'not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" *Sanford v. Clarke*, No. 1:18CV303 (LMB/TCB), 2019 WL 472256, at *15 (E.D. Va. Feb. 6, 2019), *appeal dismissed*, 778 Fed. Appx. 269 (4th Cir. 2019) (quoting *Alexander v. McClotter*, 775 F.2d 595, 602 (5th Cir. 1985)); *see also Hill v. United States*, No. 2:15-CR-00026, 2019 WL 3425049, at *17 (S.D.W. Va. May 21, 2019), *report and recommendation adopted*, No. 2:15-CR-00026, 2019 WL 2745852 (S.D.W. Va. July 1, 2019) ("Vague, unsupported allegations of ineffective assistance of counsel based on an attorney's failure to subpoena or call witnesses are insufficient under *Strickland*."). Steele presented an alibi witness in Goodman's defense, who arguably was in the best position to corroborate his claim because she spent the morning of January 9, 2015 with Goodman, was not related to him, and had no obvious incentive to lie. Whether the other two witnesses would have helped or hurt Goodman's case is academic, because no record was ever offered by Goodman on this issue.

Goodman broadly claims that a more thorough investigation would have established that he was not in West Virginia when the robbery occurred. The only specific evidence he proffers in support, however, are the video recordings and photograph, which do not substantiate his contention. Goodman supplies no evidence

setting forth the nature and extent of Steele's investigation, no testimony from Steele as to what contact he had with individuals in South Carolina, and no affidavits or other documents to suggest that Goodman intended to raise additional grounds for relief related to ineffective assistance of counsel. When given the opportunity in the state habeas proceeding to develop his grounds for relief, Goodman did nothing to expand on issues related to the witnesses in South Carolina, or any of the other shortcomings of counsel he argues in his Response. Goodman's habeas petition and related briefing focused on the video recordings and the instructions. Consequently, there is no record of any other claims before this Court and nothing to justify further development of the record at this juncture.

The WVSC explained in its affirmation of the Circuit Court's habeas denial that "a decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" (ECF No. 14-14 at 24) (citation omitted). Both the Circuit Court and the WVSC concluded that Goodman failed to establish a claim of ineffective assistance of counsel, and the adversarial process worked adequately in his case. The Fourth Circuit has reminded district courts that a state court decision on the merits of an ineffective assistance of counsel claim should be "given the benefit of the doubt," and that the standard for overcoming AEDPA deference requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Jones v. Clarke*, 783 F.3d 987, 993 4th Cir. Apr. 22, 2015) (quoting *Harrington,* 562 U.S. at 103). After examining the record, and heeding this

guidance, the undersigned **FINDS** that the determination of the state court was not contrary to or an unreasonable application of clearly established federal law.

## V.     Proposal and Recommendations

The undersigned respectfully **PROPOSES** that the presiding District Judge confirm and accept the foregoing findings and **RECOMMENDS** the following:

1. Goodman's Motion for Discovery, (ECF No. 21), be **DENIED**;

2. Goodman's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), be **DENIED**;

3. Respondent's Motion and Amended Motion to Dismiss the Petition for a Writ of Habeas Corpus and for Summary Judgment, (ECF Nos. 12, 13), be **GRANTED**; and

4. This action be **DISMISSED,** with prejudice, and **REMOVED** from   the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474

U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Berger, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner and counsel of record.

**FILED**: January 31, 2024

Cheryl A. Eifert
United States Magistrate Judge